IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA )
)
vs. ) Cr. No. 07-100S
)
RAFAEL FERNANDEZ-ROQUE, )
a/k/a Rafael Hernandez-Roque )

GOVERNMENT'S OBJECTION TO
DEFENDANT'S MOTION TO SUPPRESS ORAL AND TANGIBLE EVIDENCE

Comes now the United States of America, by and through its attorneys, Robert Clark Corrente, United States Attorney, and Mary Rogers, Assistant United States Attorney, and objects to Defendant's Motion to Suppress Oral and Tangible Evidence for reasons stated in the accompanying Memorandum.

Respectfully submitted,

UNITED STATES OF AMERICA

By its Attorneys,

ROBERT CLARK CORRENTE
United States Attorney

/s/ MARY ROGERS
MARY ROGERS
Assistant U.S. Attorney
RI Bar #3107
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
email mary.rogers@usdoj.gov

CERTIFICATION OF SERVICE

On this 8th day of January, 2008, I caused the Government's Objection to the Defendant's Motion to Suppress Oral Statements and Memorandum in Support of said Objection to be filed electronically and it is available for viewing and downloading from the ECF system.

Electronic notification:

Andrew Berg, Esq.
128 Dorrance Street, Suite 400
Providence, RI 02903

/s/ MARY ROGERS

MARY ROGERS
Assistant U.S. Attorney
RI Bar #3107
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
email mary.rogers@usdoj.gov

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | Cr. No. 07-100S |
| | ) | |
| RAFAEL FERNANDEZ-ROQUE, | ) | |
| a/k/a Rafael Hernandez-Roque | ) | |

GOVERNMENT'S MEMORANDUM IN SUPPORT OF ITS OBJECTION TO
DEFENDANT'S MOTION TO SUPPRESS ORAL AND TANGIBLE EVIDENCE

Defendant Rafael Fernandez-Roque, a/k/a Rafael Hernandez-Roque (Roque), moves to suppress his statements obtained as the result of his encounter with law enforcement on May 30, 2007, in Massachusetts. The Defendant's argument fails on several grounds. At the time of the vehicle stop there was both articulable suspicion and probable cause. After the 20 kilograms of cocaine were seen in the seat behind Roque there can be no question that there was probable cause to arrest the Defendant. The Defendant was advised of his Miranda warnings in Spanish and therefore, his statements are admissible at trial.

The government also addresses the Defendant's claim that discovery to date has been "sparse." The government objects to this patently false characterization. All Defendants were provided with complete copies of all wiretap applications, affidavits, and orders at the beginning of the case. Additionally, the government provided copies of all audio recordings made pursuant to authorization by the District of Rhode Island Courts. The Defendants were also provided with verbatim English translation transcripts for those audio recordings which the government intends to use at trial. At the same time, the government provided summary line sheets in English, which translate *all* audio recordings intercepted during the wiretaps. These summaries enable the Defendants to peruse all audio recordings to determine whether they wish to obtain verbatim

English transcripts. All of these translations are in a format that enables the user to perform computer searches on any topic or in any manner that the Defendant chooses to use. E.g. to locate intercepts by the telephone number involved, by target name, by a particular key word, by date, by the time of telephone call, etc. In addition, the government advised all defendants that there were over 90,000 intercepts recorded in the San Diego wiretaps, and that, although the government was not aware of any inculpatory evidence contained therein against their clients, other than that previously delineated to specific Defendants, that the government would make these recordings available to the defendants upon request. The government also made available DEA summary reports of surveillance conducted and of the Defendants' statements and admissions.

Finally, what causes the government the most surprise at the Defendant's mis-characterization of discovery provided as "sparse," is that the government, through Agent Naylor, met with every single one of the Defendants' attorneys, at the attorneys convenience. These meetings took place at the DEA, where all non drug evidence was available. Agent Naylor went through all documents and pointed out how various surveillances related to individual wire intercepts. As each defense attorney knew, this was done to assist the attorneys in preparing their defense in a case involving voluminous audio recordings and reports. The Defendants were all made aware that documents to which they were not entitled to at the pre trial stage, such as Jencks material, would not be provided in hard copy format prior to trial. While such documents might be provided during the discovery stage in other cases, the Defendants' attorneys clearly understood that, because of the particularly violent nature of this Drug Trafficking Organization (DTO), the government would not risk such documents ending up in DTO members' hands who are not in custody, thus placing at risk witnesses and cooperating confidential informants.

All of the facts regarding the intercepts have been available to the Defendants since the beginning of the litigation of this case; it just required the attorneys spending time reading the transcripts, a job greatly aided by Agent Naylor's pre trial assistance.

## I. FACTS

In November of 2006, the Drug Enforcement Administration (DEA) in Providence received information from the San Diego DEA office that cocaine was being transported to Rhode Island by an organization run by Eztor PLACENCIA. A substantial source for San Diego's information was from a series of San Diego Court authorized wiretaps. Based in part on San Diego's information, the District of Rhode Island obtained Court authorization to intercept wire communications occurring over telephones utilized by a target referred to as "Burras," "Juan Carlos," "Juan Carlos Diaz," "Juan Carlos Delgadillo," and "Omar," and who was ultimately identified as defendant Omar Altamirano-Nunez ("Altamirano").

Conversations intercepted in late May of 2007 indicated that Altamirano expected a shipment of cocaine from San Diego to arrive in the Rhode Island/Massachusetts area. The intercepts revealed that 29 kilograms of cocaine were expected. Intercepted conversations revealed Altamirano arranging with individuals, including co-defendants Idelfonso Betancourt-Rodriguez, a/k/a Chacho ("Betancourt"), and Rafael Fernandez-Roque, a/k/a Rafael Hernandez-Roque ("Roque"), to obtain a vehicle and their assistance to accept delivery of the cocaine.

On May 29, 2007, at approximately 8:06 p.m., Adolfo Verdugo ("Verdugo"), driving in a tractor trailer truck from San Diego, was intercepted telling Altamirano that Verdugo was about

90 miles from Springfield, Massachusetts.[1] Verdugo estimated that he would arrive there between 2 and 3 a.m. Altamirano indicated that he would go out there to meet him and spend the night.

Approximately two hours later, at 10:04 p.m., Altamirano spoke with a man referred to as Hipolito and asked to borrow a vehicle that was "legal" and in good working order. Hipolito agreed and told Altamirano that Hipolito would send a Jeep Cherokee to Altamirano. At approximately 10:20 p.m., DEA agents followed Altamirano , who was driving a Honda, from his home at 64 Stadden Street in Providence, Rhode Island to 132 Laban Street in Providence. Agents watched as Altamirano waited outside for approximately 5 minutes. Altamirano called Roque twice, first telling him to get ready because Altamirano would be there in about 5 minutes and that Roque was to come down and meet Altamirano outside. When Altamirano called Roque the second time, Roque said he would be right out. Agents then observed a Hispanic male get in the Honda. The two men then drove to Alonquin Street, in Providence. Altamirano called Betancourt and told him that Altamirano was outside. Betancourt replied, "Alright." Surveillance watched as another Hispanic male then got into the Honda with Altamirano. The Honda then drove to Roosevelt Avenue in Providence where the Jeep Cherokee arrived. When the two vehicles left Roosevelt Avenue, Altamirano was now alone in the Honda and the two co-defendants, Betancourt and Roque, were in the Jeep Cherokee.

The two vehicles drove onto route 146 where Altamirano called Betancourt who stated that he only had a quarter of a tank of gasoline. The men agreed to stop and were seen at a gas

---

[1] Verdugo spoke in coded language and asked if Altamirano-Nunez would come to "where the Simpson live." Verdugo later admitted to DEA Task Force Agent (TA) Michael Naylor that Verdugo was referring to a popular television show broadcast on the Fox network, known as "The Simpson." In that fictional cartoon series the Simpson family lives in Springfield.

station on Mineral Spring Avenue off Route 146. The two vehicles then drove in tandem, from Rhode Island to the Massachusetts' Turn-Pike, Route 90.

From 12:14 a.m. to 12:48 a.m. on what was now May 30, 2007, Altamirano made 5 calls to Verdugo's telephone, but Verdugo did not answer.

At approximately 12:47 a.m., the men were in Springfield, Massachusetts. Altamirano called Betancourt and told him that they would take the next exit off the highway. A few minutes later, Altamirano called Betancourt back and told him that they would get a room at the Econo Lodge. The men exited in Springfield, Massachusetts, where the three men checked into an Econo Lodge room under the name Juan Delgadillo.

Approximately an hour and a half later, at 2:23 a.m., Verdugo called Altamirano and stated that Verdugo was on Route 91 and that he would look for a spot and that once he found one he would call Altamirano back.

At approximately 2:30 a.m., surveillance watched as Altamirano, Roque, and Betancourt left the Econo Lodge. Altamirano entered the Honda and Roque and Betancourt entered the Jeep Cherokee. The two vehicles left the parking lot and begin driving in a manner that agents believed to be counter surveillance. The vehicles drove slowly and made a series of U-turns. The vehicles drove onto I-90 eastbound and then onto I-91 northbound. The vehicles were observed exiting I-91 at exit 21 then turning around and entering the ramp for I-91.

From 2:46 a.m to 3:14 a.m. four calls were monitored between Altamirano and Verdugo, in which Verdugo gave directions to Altamirano to where they could meet. Verdugo explained to Altamirano that he was to park between two trucks at a rest area. Altamirano replied that, "The guy is with me and has a Cherokee (Jeep)." Altamirano then called Betancourt, who was in the

Jeep Cherokee with Roque, and told Betancourt to park between the two trucks and turn everything off. Surveillance watched as the Jeep Cherokee, with defendants Roque and Betancourt, pulled off the highway and into the rest area. The Honda driven by Altamirano continued past the rest area, taking the very next exit, exit 17, and waited. The Jeep Cherokee parked in an unlit area in the rest area between Verdugo's tractor trailer truck and another tractor trailer truck. After approximately one minute, the Jeep Cherokee left the rest area stop, driving back onto I-91 southbound. The Honda drove back on t I-91 Southbound as well.

At 3:18 a.m., Altamirano called Roque and told Roque to pass Altamirano. Roque agreed. At 3:20 a.m., Altamirano called Betancourt and asked if he had gone past the "17 (exit)," and to pass Altamirano. Then Altamirano called Verdugo and asked if everything was okay. Verdugo replied that it was done.

DEA made a decision to stop the Jeep Cherokee and the Honda, as well as to talk to Verdugo in his tractor trailer truck at the rest area.

Massachusetts State Trooper Aaron Kane, in a marked cruiser, stopped the Jeep Cherokee, as DEA Special Agent James Baron pulled ahead in an unmarked vehicle. Trooper Kane and Agent Baron approached the Jeep Cherokee at the same time. Betancourt was the driver and Roque was the front seat passenger. It was ascertained that neither occupant of the Cherokee had a driver's license. Agent Baron noticed an open duffel bag in the back seat in back of Roque. There were brick like objects which Agent Baron immediately recognized as consistent with kilograms of cocaine. Both Betancourt and Roque were asked to step from the vehicle. Agent Baron opened the back seat and immediately smelled the strong odor of what he associated with the smell of cocaine. Inside the bag agents found 29 bricks of what later was analyzed as just over

29 kilograms of cocaine. Both Betancourt and Roque were arrested and told that they would be charged with trafficking in cocaine and conspiracy to violate the controlled substance act. They were taken to the State Police station at Charlton where they were advised of their Miranda rights in Spanish. Both men stated that they were unsure of their addresses in Providence and that they both worked for "Juan Carlos at a garage." Betancourt admitted that a black T-Mobile telephone (number 401/248-8931) was his and Roque admitted that a silver T-Mobile telephone found on his person was his (number 401/286-1775). The wiretap shows that both of these telephones were in contact with Altamirano's cellular telephone. Immigration determined that both men were Mexican nationals and that they were in the United States illegally. Both men admitted that.

DEA Task Force Agent Michael Naylor, Special Agent Marc, and State Police Sgt Brooks stopped the Honda driven by Altamirano, which had been just ahead of the Jeep Cherokee on I-90 East bound. Altamirano produced an Oregon driver's license in the name of Juan Carlos Delgadillo. He was in possession of the Econo Lodge key. Inside the Honda, police located both Target Telephones which the District of Rhode Island had Court authorization to wiretap (Target Telephone #2 [617/671-8665] and Target Telephone #3 [401/743-8801]). A review of the wiretap shows that Altamirano consistently sued Target Telephone #2 when he spoke with both Betancourt and Roque and that Altamirano used Target Telephone #3 when he spoke with Verdugo. Altamirano was transported to the State Police station at Charlton where he was advised of his rights under Miranda. He admitted to being a Mexican national and to being in the United States illegally.

At the rest area, State Police Officer Thomas Nartowicz and one uniformed member of the Massachusetts State Police secured the rest area by themselves. There were only two tractor

trailer trucks present[2]. The tractor had a California license plate.[3] Both Verdugo and Esteban Arias-Cortez (Arias-Cortez) were asked to step out of the truck. It was approximately 3:30 a.m. The area was dark and the two police officers could see movement inside the cab and someone looking out. Arias-Cortez and Verdugo did not exit immediately but took sometime which further heightened the officers safety concerns. Arias-Cortez and Verdugo were told to sit on the ground. Arias-Cortez was handcuffed and patted down. Verdugo had his arm in a full cast and his uncasted arm was handcuffed to his belt. He was also patted down for officer safety. The cab of the tractor was checked for weapons and other individuals. Three members of DEA arrived[4]. It was determined that Verdugo was a naturalized citizen and that Arias-Cortez was a legal permanent resident. Both men spoke English. Verdugo was told that the police had information that there was contraband in the truck. He was asked if he would allow the police to search the vehicle, but that the police did not want to search it at the rest area, but rather, at the police station. Verdugo agreed. Agent Naylor dialed the telephone on which Verdugo had been communicating with Altamirano, (909) 904-9396. Agent MacIsaac noted that the telephone rang. Verdugo admitted that it was his telephone. Arias-Cortez drove the truck to the Northhampton

---

[2] There may have been a passenger vehicle, but surveillance had noted that the Jeep had parked between the two tractor trailer trucks.

[3] The second tractor trailer truck in the rest area had one occupant who had been asleep, and the engine of the vehicle was cold showing that it had been turned off for some time. The occupant of this truck did not have a cellular telephone that appeared on either the District of Rhode Island's, Massachusetts', or San Diego's wiretaps. He did not speak with a Spanish accent. The license plate on his vehicle was from a Southern State. He is not considered a suspect.

[4] DEA Group Supervisor Dan MacIssac, Task Force Agent Chris Francesconi, and Special Agent Anthony Cardello. Agent Cardello was extremely ill and did not actively participate, although he was present.

State Police station, following Officer Nartowicz's unmarked vehicle. In a DEA unmarked vehicle, behind the tractor trailer, Agent MacIsaac and Francesconi in the front seat, with Agent Cardello and Verdugo in the back seat, followed. Verdugo consented to the search of his truck by a drug detecting canine, Nanuk. There were no positive alerts to the presence of drugs by Nanuk, although the dog did show a change in behavior (increased sniffing, tail wagging, working back and forth, and interest shown high, especially in the dash board area.). The canine handler noted that Nanuk appeared to be working out an odor source but did not positively alert.[5] Police seized cellular telephones, including number 909/ 904-9396, the telephone used by Verdugo on which he was intercepted talking to Altamirano during the wiretap. Both men signed receipts for their respective telephones. Both men were told that they could leave and both left in Verdugo's tractor trailer. Both San Diego and Massachusetts continued with their wiretaps but they have since also arrested and charged their targets. The District of Massachusetts made a related 14 kilogram seizure on June 6, 2007.

## II. ARGUMENT

### A. Defendant Roque's Admissions Were Lawfully Obtained.

When DEA decided to approach the Defendants on May 30, 2007, they had not only articulable suspicion, but also probable cause. The Supreme Court has long recognized that police must be free to pursue "legitimate investigative function[s]". Terry v. Ohio, 392 U.S. 1, 21 (1968). "A police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is

[5] Nanuk later searched the Honda and did not alert, but did give a positive alert to the rear seat interior of the Jeep Cherokee where the 29 kilograms of cocaine were located.

no probable cause to make an arrest." Id. The Supreme Court has also held that these investigatory powers include stopping motor vehicles upon reasonable suspicion. See, e.g., Michigan v. Long, 463 U.S. 1032, 1049 (1983). The two prong test enunciated in Terry requires a determination as to "whether the officer's action was justified at its inception, and whether the action taken was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. "[T]he police officer must be able to point to specific and articulable facts, which taken together with rational inferences form those facts, reasonably warrant the intrusion. United States v. Kimball, 25 F.3d 1, 6 (1st Cir. 1994)(quoting Terry, 392 U.S. at 21). The second prong requires an examination of the totality of the circumstances, see United States v. Cruz, 156 F.3d 22,26 (1st Cir. 1998), while keeping in mind that "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. Terry, 392 U.S. at 23.

Police presence combined with the detention of an individual does not automatically give rise to a finding that an individual has been arrested. See Flowers v. Fiore, 359 F.3d 24 (1st Cir. 2004)(Police Officers' stop of a vehicle, drawing weapons, subsequent handcuffing of suspect, and placement in the back of the cruiser before searching the vehicle did not rise to the level of de facto arrest. The actions were taken for the officer's safety and immediately following no discovery of weapons the suspect was released from the cruiser and the handcuffs were removed.); United States v. Taylor, 162 F.3d 12 (1st Cir. 1998)(Investigatory stop of automobile based on suspicion of drug activity was not converted into a de facto arrest by facts that officers had weapons drawn, there were 10 to 12 officers on the scene, occupants of automobile were placed face-down on the ground and frisked, egress of automobile was blocked by police cruisers

and stop lasted approximately 30 minutes.); United States v. McCarthy, 77 F.3d 522 (1st Cir. 1996)(A 75 minute un-cuffed detention in the cruiser was not considered a de facto arrest.); United States v. Trueber, 238 F.3d 79 (1st Cir. 2001)(An officer's intention to arrest does not factor into whether a legal Terry stop becomes an arrest and thus requires a Miranda warning.); United States v. Acosta-Colon, 157 F.3d 9 (1st Cir. 1998)(The use of handcuffs in the course of an investigatory stop does not automatically convert the encounter into a *de facto* arrest.)

The government submits that there was not only reasonable suspicion, and thus a basis for stopping the vehicle in which Roque was a passenger, but that there was ample probable cause to arrest Roque at the time. As stated in Terry, the police are not required to take unreasonable risks in the performance of their duties. Based upon the above, there is no question that this quantity and quality of information more than satisfies that necessary for an officer to make a Terry stop. All evidence obtained as a result of this encounter is admissible.

Additionally, "[a]n officer may conduct a warrantless arrest as long as there is 'probable cause to believe that the suspect has committed or is committing a crime.'" United States v. Bizier, 111 F.3d 214, 216-17 (1st Cir. 1997). Probable cause exists if "'at the time of the arrest, the facts and circumstances known to the arresting officers were sufficient to warrant a prudent person in believing that the Defendant had committed or was committing an offense.'" Id. at 217. "There is no requirement that th[is] belief be shown to be necessarily correct or more likely true than false." United States v. Feliz, 182 F.3d 82, 87 (1st Cir. 1999), cert. denied, 120 S. Ct. 942 (2000). In sum, the facts that the police then knew were "'sufficient to warrant a prudent person in believing'" that Roque and his co conspirators were violating the law.

## III. CONCLUSION

For all of the foregoing reasons, Defendant's motion to suppress should be denied.

Respectfully submitted,

UNITED STATES OF AMERICA

By its Attorneys,

ROBERT CLARK CORRENTE
United States Attorney

/s/ MARY ROGERS

MARY ROGERS
Assistant U.S. Attorney
RI Bar #3107
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
email mary.rogers@usdoj.gov

CERTIFICATION OF SERVICE

On this 8th day of January, 2008, I caused the Government's Objection to the Defendant's Motion to Suppress Oral Statements and Memorandum in Support of said Objection to be filed electronically and it is available for viewing and downloading from the ECF system.

Electronic notification:

Andrew Berg, Esq.
128 Dorrance Street, Suite 400
Providence, RI 02903

/s/ MARY ROGERS

MARY ROGERS
Assistant U.S. Attorney
RI Bar #3107
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
email mary.rogers@usdoj.gov