UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| United States of America, Plaintiff, | : | |
| v. | : | CR No. 07-100-03 S |
| Rafael Fernandez-Roque, Defendant. | : | |

**ORDER**

William E. Smith, United States District Judge.

This matter comes before the Court on the post-trial motions filed by the Government and Defendant Rafael Fernandez-Roque ("Defendant") in response to the Court's May 20, 2008 Order ("Post-Trial Order") purporting to reverse the Court's pre-trial denial of Defendant's motion to suppress. For the following reasons, the Government's motion for reconsideration is granted, and Defendant's motion to vacate is denied.

I. Factual and Procedural History

The factual and procedural travel of this case is somewhat unusual. In the early morning hours of May 30, 2007, during the culmination of a multi-agency drug investigation, the Jeep Cherokee in which Defendant was a passenger was stopped by the Massachusetts State Police. On the scene to assist were agents from the U.S. Drug Enforcement Administration ("DEA"), and Special Agent Ryan Arnold of the Bureau of Immigration and Customs Enforcement ("ICE"). On the backseat of the Jeep, in plain view of the agents

and state trooper, was a large duffle bag containing, it was later confirmed, approximately 29 kilograms of cocaine. A strong chemical smell emanated from the vehicle when the doors were opened. Defendant, along with the driver of the vehicle, was arrested and taken to the Massachusetts State Police station at Charlton where, for the first time, he was advised of his Miranda[1] rights by Special Agent Arnold. Specifically, Special Agent Arnold testified as follows:

> Q. [By Mr. Berg] If we could focus on the defendant, Fernandez-Roque.
> A. [By Special Agent Arnold] I approached them, identified myself as an immigration agent, presented my credentials to them and then Mirandized him in the Spanish language verbally, and then asked him a series of questions relating to his immigration status and his identity.
> Q. Did Mr. Fernandez-Roque indicate that he understood his Miranda warnings?
> A. Yes, he did.

Hrg. Trn., Jan. 14, 2008, 102:15-24. After this exchange, Special Agent Arnold proceeded to question Defendant. Defendant allegedly stated that: (1) he was unsure of his address in Providence and that he worked for "Juan Carlos at a garage"; (2) he was the owner of a silver T-Mobile telephone found on his person; and (3) he was a Mexican national who was in the United States illegally.

After an evidentiary hearing that stretched over several intermittent days from January 14, 2008 to February 13, 2008, Defendant moved for the suppression of the post-arrest statements

[1] See Miranda v. Arizona, 384 U.S. 436 (1966).

made to investigating agents during his interrogation at the State Police station. Defendant's claim that no valid waiver of his Miranda rights was ever obtained hinged on his argument that the testimony of Special Agent Arnold was devoid of any clear evidence that Defendant waived his Miranda rights and thus, since ordinarily there is a presumption against waiver, the Government could not carry its burden to establish a valid waiver by Defendant. The Court denied the motion to suppress from the bench, and indicated its intention to put its essential findings into a written order after trial. Defendant subsequently was convicted by a jury of conspiracy to distribute and to possess with intent to distribute cocaine. Post-trial, after further consideration of the relevant decisional law, and acknowledging the closeness of the call, the Court concluded, sua sponte, that it erred in denying Defendant's motion to suppress. The Post-Trial Order thus purported to grant the motion that had previously been denied, noted that it was unclear what effect, if any, the order would have on the outcome of the trial, and invited appropriate motions from the parties.

As a consequence of the Post-Trial Order, Defendant filed a motion to vacate the guilty verdict rendered against him by the jury, and the Government filed a motion for reconsideration of the Post-Trial Order. Opposing papers were filed to each motion, and the Court heard consolidated oral argument on June 18, 2008.

## II. Discussion

### A. Government's Motion for Reconsideration

In its motion for reconsideration, the Government makes two arguments regarding the appropriateness of the Court's original denial of Defendant's motion to suppress. First, it argues that the Court may rely on evidence adduced at trial, which included proof that Defendant expressly waived his Miranda rights; and second, that Defendant's admissions to Special Agent Arnold fall within the so-called "booking exception" to Miranda.

#### 1. Trial Evidence

The Government argues that the Court's initial denial of Defendant's motion to suppress is supported by evidence subsequently adduced at trial which shows that Defendant affirmatively waived his Miranda rights. The evidence in question is the testimony of Agent Arnold, which more fully set forth the circumstances surrounding Defendant's interrogation:

> Q. [By Ms. Rogers] What happened next?
> A. [By Special Agent Arnold] I was instructed to go to the Charlton, Massachusetts state police barracks and assist --
> Q. Before that, did you see the bag secured?
> A. Yes. Special Agent John Barron of the Drug Enforcement Administration, I saw him remove the bag and secure it.
> Q. And then where did you go?
> A. Then I went to the Charlton police barracks in Massachusetts to assist in interviewing the subjects.
> Q. What was your purpose in being there?
> A. I was there to conduct immigration interviews, to see if there was any immigration-related charges that we could file on the subjects.

Q. And who did you meet with there?
A. Agent-wise or suspect-wise?
Q. Suspect-wise.
A. I met with Juan Carlos Delgadillo, who's come under a whole series of aliases. He was in one cell. And then there was Rafael Fernandez and the other subject, which was -- I'm drawing a blank now. There was three subjects.
Q. Does the name Betancourt-Rodriguez --
A. Betancourt-Rodriguez. That's it.
Q. Did you speak with each of these individuals?
A. I did.
Q. Who did you speak with first?
A. I believe I spoke to Juan Carlos first.
Q. Prior to speaking with the men, what did you do?
A. I presented my credentials showing that I was an immigration agent, informed them verbally that I was an immigration agent and advised them of their rights pursuant to Miranda versus Arizona.
Q. In what language did you do this?
A. Spanish language.
Q. How did you Mirandize them?
A. I had a card in my credentials. I removed the card and read the Miranda rights verbatim from the card.
Q. After speaking with Juan Carlos, did you speak with Mr. Betancourt-Rodriguez and Mr. Fernandez-Roque individually or together?
A. They were together.
Q. <u>And did you also Mirandize them?</u>
A. <u>Yes, I did.</u>
Q. <u>Did they indicate that they understood the Miranda warnings?</u>
A. <u>Yes, they did.</u>
Q. <u>This was done in Spanish?</u>
A. <u>Yes.</u>
Q. <u>Did they agree to waive their Miranda rights?</u>
A. <u>Yes, they did.</u>
Q. A total of how many individuals did you Mirandize at the Charlton barracks that night?
A. Three people total.
Q. Was anyone else present when you were speaking with Mr. Fernandez-Roque?
A. Yes. Agent Mike Naylor of the Providence office, and there was other agents in and out of the room.
Q. And directing your attention to Mr. Fernandez-Roque, after he agreed or he indicated he understood his Miranda warnings and agreed to speak, what questions, if any, did you ask him?

A. I asked him his name, his date of birth, his parents' name, his place of birth, when he entered the country, and where he worked.
Q. And what did he reply with regard to his name?
A. Rafael Fernandez-Roque -- sorry. Rafael Fernandez -- I'm drawing a blank. I'm sorry.
Q. Roque?
A. Roque.
Q. And did he give you his date of birth and his parents' names?
A. He did. I don't recall, but I placed them in my notes.
Q. And he indicated his place of birth?
A. It was, I believe, Puerto Vallerta, Mexico.
Q. Did you ask him where he lived?
A. I did. He stated that he lived in Providence, Rhode Island but he could not remember where and that he had only been here for about a month.
Q. He had only been in Rhode Island for about a month?
A. Yes.
Q. Did you ask him where he worked?
A. I did. He stated he worked at Juan Carlos's garage.
Q. Prior to this date, May 30th of 2007, had you been involved in a related investigation out of Massachusetts?
A. Yes, I was.
Q. And as part of that investigation, had you done any surveillances of any garages?
A. Yes.
Q. And where was that garage?

MR. BERG: Object to this line of questioning, Judge.

MS. ROGERS: I'll withdraw that question.

THE COURT: Very well.

Q. Did Agent Naylor ask any questions of the defendant through you as the interpreter, Mr. Roque, after you had Mirandized Mr. Roque in Spanish and he'd waived those rights?
A. Yes, he did.
Q. And what question was that?
A. There was a silver cellular phone Agent Naylor raised up and said, "Whose is this?" I don't know if I translated that verbatim or Roque just raised his hand, but he did raise his hand and indicated that was his cellphone.
Q. After you finished at the Charlton barracks, where did you go?

A. I drove to the Northampton barracks and interviewed two other subjects.

Apr. 9, 2008 Tr. Trn., Excerpt of Arnold Testimony, 6:24-11:12. Agent Arnold thus testified that Defendant, after having been provided with a recitation of his Miranda rights, agreed to waive those rights. This testimony, if credited, addresses the concern that compelled the Court to issue the Post-Trial Order; namely, that no waiver of Miranda rights could be obtained from a record devoid of any evidence that Defendant either did or did not expressly or impliedly waive his rights.

In support of its argument that Agent Arnold's testimony should be credited, the Government cites three First Circuit cases: United States v. Brown, 510 F.3d 57, 64 n.6 (1st Cir. 2007); United States v. de Jesus-Rios, 990 F.2d 672, 675 n.2 (1st Cir. 1993), and United States v. Vargas, 633 F.2d 891, 895 n.6 (1st Cir. 1980). These cases hold that, at least where (1) a defendant had renewed his suppression motion at trial (see de Jesus-Rios), or (2) the trial evidence supports the district court's denial of a suppression motion (see Brown), the appellate panel may consider evidence adduced at trial to determine the correctness of a district court's ruling on a pre-trial motion to suppress. See also United States v. Hicks, 978 F.2d 722, 724-25 (D.C. Cir. 1993) ("[R]eviewing courts routinely consider trial evidence in affirming pre-trial suppression rulings."); United States v. Corral, 970 F.2d 719, 723 (10th Cir. 1992) ("As a reviewing court, we are not

confined simply to the evidence adduced during the suppression hearing. In evaluating the correctness of the district court's rulings, the appellate court may consider the entire record developed from the trial even though such evidence may not have been presented during the suppression hearing."); United States v. Pearson, 448 F.2d 1207, 1210 (5th Cir. 1971) ("Evidence adduced at trial may be considered even though the evidence on the motion to suppress was insufficient to justify the search.").

Defendant objects that it would be improper for this Court to apply to its own deliberations a rule of law that has developed and been applied only in the context of appellate proceedings. However, while it is true that the decisions cited by the Government have arisen in the appellate context, this appears to be the result more of the rarity of a district court moving post-trial to reverse a pre-trial suppression order than of any exclusive jurisdiction claimed by the courts of appeal. For example, in Hicks, the District of Columbia Circuit remarked that reviewing courts routinely consider trial evidence in affirming pre-trial suppression rulings because "[i]t would be wasteful to remand so that the district court could reconsider its denial of a suppression motion in light of trial evidence the reviewing court believes supports the denial." Hicks, 978 F.2d at 725.

Here, where as yet there is no appeal, it actually would be most efficient for this Court to reconsider, in light of the

evidence adduced at trial, whether it acted appropriately in reversing its denial of Defendant's motion to suppress. It is fair to assume that the First Circuit would apply this established rule of law; thus, it would be wasteful to have the matter go up on appeal only to be remanded.

It comes as no surprise, then, that Defendant argues the First Circuit would not consider the trial evidence in evaluating the Court's ruling on Defendant's motion to suppress. Defendant points to Vargas, wherein the First Circuit commented that "the use of trial testimony to undermine the validity of an arrest or search is apparently discouraged, at least when the motion to suppress has not been renewed and reconsidered during the course of the trial." Vargas, 633 F.2d at 895 n.6; see also Hicks, 978 F.2d at 724 ("An appellate court should not rely on evidence first produced at trial to reverse a pre-trial denial of a suppression motion not renewed at trial."). Defendant's argument, while not unreasonable, appears to flow from a misapprehension of the Government's motion for reconsideration. By moving for reconsideration, the Government is asserting that the Court's original denial of Defendant's motion to suppress was correct, and that the Court should retract its purported reversal of that denial. In other words, by appealing to the evidence adduced at trial, the Government is attempting to bolster the Court's pre-trial denial of Defendant's motion to suppress; it is not seeking to undermine that denial. Although

Defendant may believe otherwise, the Post-Trial Order did not erase from memory the Court's pre-trial denial of the motion to suppress.[2] Assuming that the Court had not issued its Post-Trial Order, the Defendant would have been in possession of an order denying his motion to suppress, and trial evidence tending to support the denial. If he had chosen to appeal the denial, the First Circuit, if it so chose, could use that trial evidence to uphold the denial - even if Defendant had not renewed his motion during the trial. See Brown, 510 F.3d at 64 n.6 ("if facts presented at trial support the district court's denial of the motion to suppress, the appellate court may consider them"). In short, the Court does not agree that using the trial evidence to reinstate the original denial of Defendant's motion to suppress is tantamount to using it to "undermine" the Court's ruling.[3]

---

[2] In this sense, it probably was a mistake for the Post-Trial Order to "grant" Defendant's motion to suppress. The Court did not locate any cases discussing the authority of a district court to grant, post-trial, a motion it had already denied pre-trial. But it seems reasonable to suppose that such authority is lacking, and that it would have been more appropriate to conclude the Post-Trial Order by saying that the motion to suppress "should have been granted."

[3] Although Defendant makes the additional objection that notions of "fundamental fairness" weigh against the use of trial evidence, the First Circuit has already taken note of this type of argument and dismissed it, if only half-heartedly. See United States v. Brown, 510 F.3d 57, 64 n.6 (1st Cir. 2007) ("While we take note of arguments against the rule made by academics, and the different practice in some states, we feel bound to follow it unless and until an en banc panel decides otherwise." (internal citations omitted)).

Therefore, the Court concludes it may appropriately consider the evidence adduced at trial and that the evidence supports the original denial of Defendant's motion to suppress.[4]

2. Booking Exception

The Government additionally argues that the Court's initial denial was correct for the simple reason that no Miranda warnings were even required. The Government reaches this conclusion by construing the evidence presented at the suppression hearing as showing that Agent Arnold questioned Defendant only to determine the latter's alien status. According to the Government, this type of questioning falls within the "booking exception" to Miranda, which permits government agents to ask of a criminal suspect questions that are intended to elicit routine background or booking information, e.g. a suspect's name, address, and related matters. See United States v. Doe, 878 F.2d 1546, 1551 (1st Cir. 1989). This is because such questions rarely involve the risk that a suspect may provide incriminating information as a result of the type of psychological intimidation that Miranda warnings are designed to prevent. Id. The booking exception does not apply,

---

[4] There is an anomaly here. This Court denied the Government's motion to reopen the suppression hearing for reasons stated in the Post-Trial Order. The Court believed then, and continues to believe that this was the correct decision. Now the Government effectively is achieving the same result by the use of the trial evidence. The fact that this result is somewhat anomalous and that the Government gets a "do-over," however, cannot undo the strong precedential authority weighing in favor of considering trial evidence.

however, where the law enforcement officer, "under the guise of asking for background information, seeks to elicit information that may incriminate." Id.; see also United States v. Reyes, 225 F.3d 71, 76-77 (1st Cir. 2000) ("[T]he inquiry into whether the booking exception is thus inapplicable is actually an objective one: whether the questions and circumstances were such that the officer should reasonably have expected the question to elicit an incriminating response.").

In Reyes, an agent of the Immigration and Naturalization Service ("INS") assigned to work with the DEA, interviewed a criminal suspect "for the purpose of 'booking' him, i.e., obtaining the information required by the DEA's standard personal history form for administrative purposes." 225 F.3d at 74. The Court held that this interview fell within the booking exception to Miranda:

> Under the circumstances, we conclude that Agent Smith's questions to appellant-requesting his name, date of birth, and social security number-fall within the booking exception to Miranda's warning requirement. We think it significant that Smith asked only those questions indicated on the standard DEA booking form, with no reference whatsoever to the offense for which appellant had been arrested. The booking interview was conducted separate from any substantive interrogation, by a different officer and in a separate room at a separate time, just as we suggested in Doe would be typical of legitimate, routine booking interviews. (Citation omitted.) Although the record does reflect that Agent Smith suspected that appellant might not be a United States citizen, Smith explicitly disavowed at the evidentiary hearing any intention to question the appellant beyond what was necessary to complete the personal history form.

Id. at 77. Here, by contrast, both Agent Arnold and Agent Michael Naylor testified that a Massachusetts State Police trooper had already taken it upon himself to book Defendant. Agent Naylor testified: "There was a Massachusetts state trooper there doing the booking who spoke Spanish. He was interviewing [Defendant] enough to do the booking sheets and things like that, sir. So I was relying on the Massachusetts state trooper, any information he got from him, as well as Agent Arnold." Jan. 22, 2008 Hrg. Trn., 191:12-17. Agent Arnold similarly testified: "[Defendant] was in the process of being booked. I'm not sure he had been completed or not. I'm not sure if I interviewed him and then the booking officer, because I remember there was some confusion there at the end of it, and I had to go back and ask him if [his name] was Fernandez or Hernandez." Jan. 17, 2008 Hrg. Trn., 25:18-23. In short, neither Agent Arnold nor Agent Naylor were interviewing Defendant for the purpose of booking him.

Indeed, the testimony of both Agent Arnold and Agent Naylor shows that their questioning was intended to elicit information beyond that required to complete the booking process. For example, Agent Arnold testified that among his goals in questioning Defendant was to determine whether any crime had occurred:

> Q. [By Mr. Berg] I assume you identified yourself as being an immigration officer to Mr. Fernandez-Roque; is that correct?
> A. [Special Agent Arnold] Yes, sir.

Q. You also testified that you conducted an interview or you ascertained names of relatives; is that correct?
A. Yes, sir.
Q. And I think you used the term or you said something about trying to determine alienage and deportability?
A. Yes, sir.
Q. Is that what your goal was at that point?
A. That was one of the goals, to see if we could place an immigration detainer on them.
Q. Is it also one of your goals to find out if this person might have committed a criminal offense, such as illegal reentry?
A. Yes, sir.
Q. <u>So it was also one of your goals to find out if a crime had occurred; is that correct?</u>
A. <u>Yes, sir.</u>

Jan. 17, 2008 Hrg. Trn., 23:8-24:3. Similarly, Agent Naylor's testimony demonstrates that this was not a booking interview:

Q. [By Ms. Rogers] Okay. Were you present when Immigration and Customs Enforcement or ICE agent, Ryan Arnold, spoke with Mr. Roque and Mr. Betancourt?
A. [By Agent Naylor] Yes, I was.
Q. In what language did he converse with them?
A. He was speaking in Spanish, ma'am.
Q. And were you asking or participating in any way with Agent Arnold?
A. Yes. I was asking him some questions to ask. I asked him -- one of the questions, you know, did they tell you where they work was one question. Something about their employment. And another question was on the phones, I asked whose phone was whose.
Q. All right. With regard to a silver T-Mobile telephone, did you do anything specific with that?
A. Yes, I took that phone up, and I brought it in the room, and I asked ICE Agent Arnold to ask whose phone this was.

Jan. 22, 2008 Hrg. Trn., 108:17-109:9. As this testimony illustrates, the questioning by Agent Arnold and Agent Naylor was

not part of the booking process and included questions, such as the inquiry into ownership of the confiscated mobile telephones, more directed at eliciting incriminating statements. Accordingly, the Court does not agree that the booking exception to Miranda is appropriately applied to statements made by Defendant during his interrogation.

B. Defendant's Motion to Vacate

Based on the above findings with respect to the Government's motion for reconsideration, the Court concludes that its original denial of Defendant's motion to suppress is supported by the evidence adduced at trial, and therefore the Court erred in issuing its Post-Trial Order reversing the denial. Consequently, Defendant's motion to vacate must be denied. However, even if the Post-Trial Order were allowed to stand, the Court concludes that the admission into evidence of the statements elicited from Defendant would constitute harmless error and that, consequently, Defendant's motion to vacate should in any event be denied.

The First Circuit has said that "[s]tatements induced in violation of Miranda's safeguards are appropriate for analysis under the 'harmless beyond a reasonable doubt' test." United States v. Batista-Polanco, 927 F.2d 14, 21 (1st Cir. 1991) (citation omitted). This is because the introduction at trial of evidence obtained in violation of Miranda constitutes a "trial error." United States v. Downs-Moses, 329 F.3d 253, 267 (1st Cir.

2003) (citing Arizona v. Fulminante, 499 U.S. 279, 307-08 (1991)). "Trial errors -- unlike structural defects in a prosecution, such as the total deprivation of the right to trial counsel -- occur during the presentation of evidence to the jury and therefore may be 'quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.'" Id. at 267-68 (internal citations omitted). The First Circuit has said of the harmless-error doctrine that it

> is essential to preserve the principle that the central purpose of a criminal trial is to decide the factual question of a defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.

Id. at 268 (internal citation omitted). The harmless-error test can be difficult to apply where, as here, the jury returned a general verdict. As the First Circuit observed:

> Moreover, although the Supreme Court has said that the admission of an involuntary statement mandates vacation of the conviction even though other admissible evidence in the case would have been sufficient to convict, it did so on the ground that reliable analysis under the "harmless beyond reasonable doubt" test is impracticable "where . . . a coerced confession constitutes a part of the evidence before the jury and a general verdict is returned [as] no one can say what credit and weight the jury gave to the confession."

Batista, 927 F.2d at 21 (citations omitted) (emphasis in original). In Batista, for example, the First Circuit was in the position of reviewing a bench trial verdict, which was based on the judge's

special findings of fact. Thus, the First Circuit was able to discern "beyond a reasonable doubt" what evidence informed the judge's verdict. Since the special findings of fact made no mention of the defendant's challenged admission, the First Circuit held that any alleged constitutional error was harmless beyond a reasonable doubt. Id.; see also United States v. Leon-Delfis, 203 F.3d 103 (1st Cir. 2000).

Nevertheless, even where a general verdict is returned, the Court is not foreclosed from finding harmless error. In Downs-Moses, 329 F.3d 253, the First Circuit held that any error in admitting the defendant's post-arrest statements was harmless. The appellate panel did so without the benefit of a special jury verdict or special findings of fact. Instead, the holding was based on the weight of all the other evidence that was before the jury. Id. at 267-68.

Here, Defendant's post-arrest statements were insignificant in light of all the other evidence presented. Even without those admissions, the Government produced an overwhelming amount of evidence. The Government had multiple recordings of intercepted conversations between the participants in the drug transaction, including Defendant. Defendant stipulated to all of the transcripts made from the recordings. The Government had evidence that Defendant spoke with Juan Carlos a/k/a Omar Altamirano-Nuñez, the leader of the drug conspiracy. The Government had evidence

that Defendant accompanied his co-conspirators to the drug transaction, that Defendant called Juan Carlos to say "I'm ready" immediately after the 29 kilograms of cocaine changed hands, and that the cocaine was located directly behind Defendant in an open bag, reeking of the smell of cocaine when the vehicle in which he was riding was stopped by the Massachusetts State Police. Moreover, a mobile telephone that had been used to place intercepted calls was found on Defendant's person, and it was conceded that the voice on those intercepts was that of Defendant. The intercepted phone calls further evidence that Defendant knew Juan Carlos and telephoned him after midnight in the course of the drug transaction. On these facts, and others not detailed here, the Court finds that even if an error occurred in admitting Defendant's post-arrest statements, that error was harmless.[5]

III. Conclusion

For the foregoing reasons, Defendant's motion to vacate is DENIED; the Government's motion for reconsideration is GRANTED. The Court's Post-Trial Order is VACATED.

It is so Ordered.

WESmith

William E. Smith
United States District Judge
Date: 7/21/08

[5] Based on the findings herein, the Court does not reach the parties' arguments regarding whether the Court possesses the authority to order a new trial at this juncture.